**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**BALDINO'S LOCK & KEY SERVICE, INC.**

      **Plaintiff,**

**v.**

**Google, Inc. et al.,**

      **Defendants.**

_____/

# **COMPLAINT**

Plaintiff BALDINO'S LOCK & KEY SERVICE, INC., a Virginia

Corporation ("Plaintiff") sue Google, Inc. et al ("Defendants") and allege:

## **PARTIES**

1) Plaintiff BALDINO'S LOCK & KEY SERVICE, INC. ("Baldino's"), is a

Virginia corporation providing locksmith and related security services. Its

principal place of business is 7000-G Newington Road, Newington, VA 22122.

Plaintiff holds locksmith licenses in Maryland and Virginia and is registered to

do business in the District of Columbia.  Plaintiff operates eleven store

locations in Virginia and four in Maryland that service the DC Metro area.

2)  Baldino's is one of only approximately five locksmith companies registered to do business in the District of Columbia. Plaintiff conducts substantial business operations in the District of Columbia.

3)  Plaintiff operates a website at: http://www.baldinos.com.

4)  Defendants are internet-based information content organizers and creators ("Search Engines").  Internet search is engines are a relevant market.  This market is dominated by Defendants.

5)  Microsoft Corporation operates a Search Engine at: www.Bing.com.

6)  Microsoft Corporation is a Washington State corporation and has its principal place of business in Washington.

7)  Google Inc. operates a Search Engine at: www.google.com.

8)  Google Inc. is incorporated in Delaware and has its principal place of business in California.

9)  Yahoo! Inc. (yahoo.com) operates a Search Engines at: www.yahoo.com.

10) Yahoo! Inc. is incorporated in Delaware and has its principal place of business in California.

## JURISDICTION

11) This Court has jurisdiction under 28 USC § 1331, federal rights of action

because this action includes claims for unlawful abuse of monopoly power, 15

U.S.C. § 15, and false designation of origin of services under the Lanham Act,

15 U.S.C. § 1125(a)(1)(B).

12) Jurisdiction also exists under 28 USC § 1332, Diversity of Citizenship,

because Baldino's principal place of business and state of incorporation is

Virginia and none of the defendants are incorporated in Virginia or have their

principal place of business in Virginia.

13) Venue is appropriate in this Court under 28 USC § 1391 because Plaintiff does

business in the District of Columbia and all defendants conduct business in the

District of Columbia.

14) This Court has personal jurisdiction over each and every defendant per the

District of Columbia Long-Arm Statute, D.C. Code Ann. § 13-423, because

each and every defendant: a) contracts to supply services in the District of

Columbia, b) has caused tortious injury to Plaintiff in the District of Columbia

by acts or omissions outside the District of Columbia while regularly doing

and soliciting business, engages in persistent advertising within the District of

Columbia, and/or derives substantial revenue from services rendered in the
District of Columbia;

15) The minimum jurisdictional damages requirement is met for each Defendant.

# FACTS COMMON TO ALL COUNTS

## I. DEFENDANTS' MONOPOLY POWER

16) Internet search is the primary avenue through which prospective customers seek locksmiths.

17) Internet search engines used by consumers in the United States constitutes a relevant market.

18) Approximately 70% of all organic internet search queries conducted in the United States are done on search engines controlled by Google Inc. ("Organic" search results are the unpaid list of links displayed by search engine defendants, ordinally ranked by their respective "relevancy" to a consumer's search term).

19) Approximately 20% of all organic internet search queries conducted in the United States are done on search engines controlled by Microsoft Corporation.

20) Approximately 12% of all organic internet search queries conducted in the United States are done on search engines controlled by Yahoo! Inc.

21) Defendants together control approximately 90% of organic and map internet search originating in the United States.

22) Defendants have market power over the relevant market comprised of domestic search engines.

23) Defendants knowingly and deliberately flood organic search results displayed in response to queries such as "locksmith" (and related terms) with scam locksmith listing they know: 1) do not exist at all, or at least not at the locations indicated, 2) operate for the purpose of defrauding the consumer public, 3) are not licensed in jurisdictions mandating locksmith licensing, 4) are unregistered to do business in jurisdictions (such as DC) requiring business registration.

24) Defendants flood the market with fictitious listings to dilute Plaintiff and other legitimate locksmiths' listing in the organic and map results to the point of obscurity, thereby compelling them to pay Defendants for paid advertised results merely to be seen by the same prospective customers they should have

contacted, were Defendants' organic and map results not flooded with results that Defendants know are fictitious.

25) Consumers' ability to discover and contact Plaintiff and other legitimate locksmiths has been severely restricted by Defendants' conduct because Defendants control essentially the entire internet search industry.

26) Defendants are able to genuinely thwart the general consumer public from prospective business relationships with Plaintiff and other legitimate locksmiths because they have market power over the internet search industry.

27) Defendants use their dominance of the relevant market to extract monopoly profits.

28) Defendants abuse their market power over organic and map internet search to manufacture otherwise non-existing demand for paid advertised search results.

29) Abuse of market power is a Federal Crime under 15 U.S. Code § 2.

30) Plaintiff has lost approximately $1 million in revenue per year since 2009 as a direct result of Defendants' abuse of monopoly control over the internet search industry.

## II.  SCAM LOCKSMITHS

31) Consumers generally prefer dealing with nearby locksmiths.  This is especially true when seeking a locksmith for an emergency situation, typically where a consumer is locked out of his or her home or car.

32) Locksmithing is a licensed profession in Maryland.  Maryland Code, BUSINESS REGULATION § 12.5.

33) Locksmithing is a licensed profession in Virginia. Code of Virginia § 9.1-139.

34) Locksmiths doing business in the District of Columbia are required to register for a business license.  Code of the District of Columbia § 47–2851.03d.

35) The identities, addresses, and phone numbers of licensed locksmiths in both Maryland and Virginia is a matter of public record, freely accessible to Defendant search engines.

36) Most consumers do not have an ongoing relationship with a locksmith.

37) Location-based internet search (through cell phone or personal computer) is the primary means by which prospective customers seek locksmith services, especially for emergency lock-out situations.

38)  Consumers needing emergency locksmith services are vulnerable to locksmith scams. Addressing this consumer vulnerability is the primary purpose of locksmith licensing.

39) Numerous companies and individuals hold themselves out as locksmiths with intent to defraud the public. These fraudsters are widely known as "scam locksmiths".

40) Scam locksmiths publish hundreds or thousands of unique websites targeting geographic locations all around the country. They misrepresent their services offered, pricing, expertise, training, who is behind the website, their location, contact information, and whether they are licensed or registered to do business.

41) Scam locksmiths' websites display either fictitious or no address, and include false claims that they are local businesses with local phone numbers. They do this deliberately, to misrepresent themselves to consumers as nearby businesses.

42) When a user calls the local area-code phone number for the scam locksmith, he or she may be put through to a call center, in another city or even another country. An operator sends over a putative "locksmith" on behalf of the scam company.

43) The scam-locksmith usually lacks the experience and specialized tools needed, typically tells the customer the problem is worse than expected and takes some drastic, destructive action (like drilling out the caller's lock). He then demands immediate payment in cash only for many times the usual bill.

44) Scam locksmithing is a well-documented and widespread consumer fraud. The Federal Trade Commission has issued consumer warnings regarding fraudulent locksmiths.  *See*: https://www.consumer.ftc.gov/articles/0089-finding-locksmith

## III.  SCAM LOCKSMITHS ARE ENABLED BY DEFENDANTS' ABUSE OF MONOPOLY POWER

45) Defendants publish at least three categories of material: a) Third-party content that Defendants have used to abuse their monopoly power, b) Defendants' original content, created out of whole cloth, and c) Enhanced content that was derived from third-party content, but has been so augmented and altered as to have become new content and not mere editorialization.

46) Defendants publish third-party websites created by scam locksmith that they know do not exist at the addresses stated thereon, and which they know exist for the purpose of defrauding the consumer public.

47) Addresses listed by Defendants are often different than those listed on third-party scam locksmiths' linked-to websites or do not appear on the linked-to websites at all.  These fictitious addresses are Defendants' own original content, displayed on their own websites, and have no third-party origin.

48) Defendants publish these third-party websites in sufficient quantities on their organic and map results to severely bury and obscure legitimate locksmith businesses such as Plaintiff from prospective customers.

49) Defendant Search Engines deliberately flood their own organic and map results with locksmith listings they know are seriously inaccurate or even nonexistent to induce both legitimate and scam locksmiths to participate in paid results to overcome the false information.

50) Scam locksmiths promote themselves almost exclusively on the internet and are fundamentally dependent on Defendant search engines to obtain exposure to prospective customers. The have almost no exposure to print, television, billboard, or other traditional media because state regulations do not allow those publishers to run advertisements and post other public notifications for unlicensed, unregistered, or otherwise identifiably unethical businesses such as these.

51) Instead, scam locksmiths exist only in and because of the space created for them by Defendants, who together control nearly all of the consumer public's access to internet websites.

52) But for Defendants' willful, knowing, and abusive promotion of scam locksmiths, scam locksmithing would be reduced to a trivial matter.

53) Defendants have deliberately created an environment in which unlicensed, unregistered, and otherwise scam locksmiths can exist by abusing their monopoly control of internet search.

54) Scam locksmiths could not operate without the knowing assistance of Defendant Search Engines.

55) Defendants are well aware of both this scam-locksmith problem and their own roles in enabling these scam locksmiths to operate.

56) Defendants deliberately use links to scam locksmiths to aggressively manufacture demand for their own paid advertised results that would not exist but for their abuse of their monopoly control of internet search.

57) Defendants deliberately bury legitimate locksmiths such as Plaintiff under a long list or map grouping of locksmiths they know are scam operations in order to compel both legitimate and scam locksmiths to pay for advertising positions in Defendants' paid results that locksmiths (including Plaintiff) would otherwise not purchase.

58) Defendants bury legitimate locksmith listings (such as Plaintiff's) in their organic and map listings to oblige them to pay more than they otherwise would have paid in order to be seen by prospective consumers.

59) Defendants not only publish links to websites of scam locksmiths, they also enhance those listings on their own search engine websites by creating brand new content not found on the original web sites.

60) Defendants create and display brand new content created solely by Defendants on Defendants' own search engine websites to enhance their own search results.

61) Defendants' original content materially enhances the ability of scam locksmiths to deceive the public.

62) The majority of Defendants' organic search results for 'locksmith' and related queries are scam locksmith listings.

63) The majority of Defendants' map search results for 'locksmith' and related queries are scam locksmith listings.

64) The majority of Defendants' paid search results for 'locksmith' and related queries are scam locksmith listings.

65) Defendants display geographically targeted paid search results alongside their organic results and map results.  These paid search results are Defendants' primary source of business revenue.

66) Defendants are on actual notice that they are displaying organic, map, and paid search results for unlicensed locksmiths in jurisdictions requiring licensing.

67) The exact identity, location, license number, and contact information of each Maryland locksmith is a matter of public information and is published by Maryland's government.

68) Maryland Code §12.5–401 requires that: "Each locksmith advertisement, business card, or any other means of providing notice to the public of the

business providing locksmith services shall include the name of the licensed

locksmith and the license number of the licensed locksmith."

69) Defendants display locksmith advertisements and multiple other types of

notices to the public that do no include the name and license number of the

locksmith, in violation of Maryland law.

70) The exact identity, location, license number, and contact information of each

Virginia locksmith is a matter of public information and is published by

Virginia's government.

71) Code of Virginia § 9.1-149.1 similarly requires that all locksmith

advertisement only be for licensed locksmiths.

72) Defendants display numerous advertisements for unlicensed Virginia

locksmiths in violation of Virginia law.

73) The identity of all locksmiths registered to do business in DC is a matter of

public knowledge, freely available to Defendants, because all businesses must

register with the DC government.

74) The DC government publishes a list of registered businesses on the internet at:

https://eservices.dcra.dc.gov/BBLV/Default.aspx

75) Displaying advertisements or other notices on behalf of an unregistered DC

business is unlawful.

76) Defendants display numerous advertisements and other public notifications for

unregistered DC locksmith in violation of DC law.

77) Defendants' original content includes fictitious addresses, photos, map locations, and map pinpoints for scam locksmiths as well as driving directions to and from the fictitious locations.

78) Defendants rightfully claim copyright protection for the newly created content because it does not originate from a third-party website.

79) The Defendants' original content does not appear anywhere on the internet except on Defendants' own websites and on websites contractually authorized by Defendants to republish the Defendants' content via RSS feed.

80) This newly created content is published on defendant's search-engine websites separately and independently from content culled from scam locksmiths' websites.

81) Defendants' original content independently and deliberately deceives consumers beyond the original deception purveyed by the scam locksmiths themselves.

82) For example, Defendants independently determine the location of a requesting consumer, then create and publish non-interactive maps which purport to show locksmiths' locations in relation to the consumer's location.

83) The Defendants' original content is not interactive and can not be altered or edited by anyone but the Defendants.

84) Paid results and organic results are displayed side-by-side on the same webpage, as are paid results and map results.

85) Paid results are displayed only to users in specific geographic areas, like map results.

86) Organic results ordinally ranked to factor in geographic proximity, with the same restrictive result because consumers only look at the first group of (what are typically millions) of organic search results.

87) Defendants' publication on their own websites of their own original content related to scam locksmith listings has destroyed Plaintiff's good will.

88) Defendant Search Engines unlawfully facilitate, enhance, and legitimize scam locksmith services.

## IV. DEFENDANTS' ALGORITHMS: TOOLS OF ABUSE

89) Defendants' use mathematical algorithms to automatically sort, categorize, and ordinally rank websites according to Defendants' opinion of their "relevancy" to a consumer's specific search term in a specific geographic area.

90) Defendants' algorithms consider a website's participation in paid advertised search results in determining their ranking in their organic results.

91) Defendants' algorithms reward websites that pay Defendants for advertising by advancing them in the organic results ahead of websites that do not pay Defendants for positions in the paid results.

92) Correspondingly, Defendants' algorithms demote websites in the ordinal organic search ranking based on their non-participation in Defendants' paid advertising.

93) Defendants algorithmic results are designed to maximize their own profit from paid advertisements by penalizing non-payers with demotion in Defendants' organic results and promoting websites in their organic result who pay them in the paid results.  The degree or promotion and demotion in the organic results based on payment for paid results is a fundamental part of the Defendants' algorithm, whose entire purpose is to maximize Defendant's profit.

94) Defendants manually alter algorithmic results to maximize profitability of correlated paid advertisements and factor in inputs to influence and maximize their own profitability via website owner's participation in paid advertised search results.

95) Defendants' algorithms are created to maximize Defendants' profits by flooding their own organic and map results for 'locksmith' and related queries with results they know or should know are unlicensed, unregistered, or do not exist at addresses indicated by those websites or created by Defendants themselves.

96) Defendants have the technology to automatically verify the accuracy of locksmith locations, licensing, and other critical details, but deliberately do not apply this technology.  For example, Defendants could use similar technology

used to flag images of child pornography to flag their own 'street view'
photographic images that clearly do not display retail locksmith shops at
addresses indicated by those parties.

## V.  DEFENDANTS' BAD FAITH

97) Plaintiff has paid Defendants for a link to his website to appear in defendants'
paid search results.

98) Plaintiff's website listing is buried underneath hundreds (or even thousands) of
organic, paid, and map listings of companies that Defendants' search engines
and directory services are fully aware do not actually exist.

99) Because Plaintiff's listing is buried in Defendants' search results, he is obliged
to pay Defendants for advertising to obtain customers.

100) Defendants have knowingly diluted the value of Plaintiff's paid
advertisements by deliberately allowing illegitimate locksmiths to occupy the
same paid advertising spots, typically through a bid-for ordinal position
system.

101) Defendants knowingly dilute the value of Plaintiff's paid advertisement in
order to induce Plaintiff to overpay for advertising, simply to be seen by the
same prospective customers that would have seen him in Defendants' organic
and map results, but for Defendants' crowding him out with scam listings.

# VI.  DEFENDANTS ARE ON NOTICE

102) Defendants have received numerous notices that they are publishing listings for locksmiths with fake addresses or fake contact information.

103) Defendants have received numerous notices that they are publishing listings for Maryland and Virginia locksmiths that are unlicensed in those states.

104) Defendants are on actual notice that they are publishing listings for unlicensed locksmiths in both Maryland and Virginia.

105) Search Engine and Directory defendants are on actual notice that the great majority of results they post for queries to 'locksmiths' (and related queries) conducted in DC are not registered with the DC government to do business in DC.

106) Search Engine and Directory defendants are on actual notice that the great majority of results they post for queries relating to 'locksmiths' conducted in Maryland, Washington DC, and Virginia do not exist at the physical street addresses at which the defendant Search Engines and Directories indicate they exist.

107) Plaintiff has lost business in the amount of approximately $1 million per year since 2009 as a direct result of Defendants' actions.

108) Plaintiff has also lost tremendous and valuable good will in the community and been confused by the public with scam locksmiths as a direct result of Defendants' wrongful actions.

## COUNT I - Abuse of Monopoly Power

109) Defendants have violated 15 U.S. Code § 2 by abusing their monopoly power over organic and map internet search.

110) Defendants knowingly and deliberately bury Plaintiff and other legitimate locksmiths under a large number of results they know are: a) Located in Maryland or Virginia and are unlicensed, b) Located in Washington, D.C but unregistered to do business in DC, c) Do not exist at the addresses indicated by the linked-to website, d) Do not exist at addresses created by Defendants and indicated by the Defendants on their own search-engine websites, or e) Are otherwise known to Defendants as scam locksmiths whose intent is to defraud the consumer public.

111) The need to compete with organic listings by paying for advertising spots alongside the organic listings is artificially manufactured by the defendants by listing large numbers of artificial listings in their organic results, burying the authentic listings.

112) Defendants knowingly and deliberately flood their organic results (including map results) with fake listings in order to induce legitimate locksmiths to pay them for advertising spots.

113) Defendants' market power allows them to unlawfully manipulate the relevant market.

114) Defendants have abused their monopoly power to compel Plaintiff to pay them for advertising positions Plaintiff would otherwise not purchase.

115) Defendants have abused their monopoly power to compel Plaintiff to pay them an unreasonably high amount for advertising positions.

116) Plaintiff's business has been harmed as a direct result of Defendants' abuse of monopoly power.

## COUNT II - Common Law Fraud

117) Defendants have represented that their organic and map results are accurate, legitimate, and lawful.  This representation is false and deceptive.

118) Defendants have represented that the paid advertisement spots they display alongside their organic and map results are a scarce and valuable commodity because of the authentic shortage of prime (i.e. first page) listing space in the organic results.  This representation is false and deceptive.

119) The scarcity of prime listing space for locksmiths is due to Defendants' knowing publication of fictional or unlawful listings.

120) There are only a handful of locksmiths with store locations in Washington DC. There is room for every single legitimate locksmith business registered to do business in Washington DC to appear on the first page of organic or map queries seeking locksmiths in Washington DC.

121) Defendants' creation of original content (such as, but not limited to addresses not appearing on third-party websites) has materially created a sense of legitimacy for scam locksmiths in the minds of consumers and thereby directed prospective customers away from Plaintiff's business.

122) Defendants' creation of original content (such as, but not limited to street addresses not appearing on third-party websites) has materially contributed to obscuring Plaintiff's listing in both Defendants' organic and map results.

123) Defendants create original content to enhance third-party scam listings for the explicit purpose of burying legitimate businesses such as Plaintiff in a pile of fake listings.

124) Defendants bury legitimate businesses such as Plaintiff to artificially create competition for paid advertising spots amongst locksmiths such as Plaintiff

seeking merely to be seen by the same prospective customers they would be seen by but for Defendants' actions.

125) Manufacturing artificial demand for advertising spots is an explicit, deliberate part of the defendant's business plan.

126) Defendants' manufactured demand is material. Were plaintiff to decline to pay for advertising, his business would be buried under fake, unlawful, or deliberately misleading organic and map results to the point of obscurity.

127) Defendants intend that plaintiff pay them for advertising due to this manufactured demand.

128) Defendants earn the vast majority of their profits through internet advertising. Inducing business to pay them for advertising to overcome obscurity in Defendants' organic and map results is the thrust of their entire business model.

129) Plaintiff was not aware that Defendants were using fake organic listings to create demand for the paid advertising spots he paid for.

130) Plaintiff was not aware that Defendants were using fake organic listings to drive up the price of the advertising spots he paid for.

131) Instead, Plaintiff relied on Defendant's good names and assumed that their business practices were both legitimate and forthright.

# COUNT III - Tortious Interference with an Economic Advantage

132) Plaintiff obtains customers through each of the defendant search engine and

directory services.

133) Plaintiff's business can not be seen by prospective consumers because

Defendants display unlicensed, unregistered, inaccurate, or otherwise unlawful

listings that block customers from seeing Plaintiff's listing, causing him to lose

business.

134) Each and every Defendant is on actual notice that their conduct is interfering

with Plaintiff's ability, and the ability of other legitimate locksmiths, to reach

potential customers.

135) Plaintiff has reasonably anticipated business expectancies of significant

economic value that are being thwarted and directed away from Plaintiff by

Defendants' actions.

136) Defendants' actions are both inducing and causing an actual breach in the

Plaintiffs expectant customers from contacting him for locksmith and related

security business.

137) Plaintiff has suffered a loss in business volume, a loss in business revenue, and

damage to his good will and trade name as a direct result of defendants'

tortious interference.

## COUNT IV - Unfair Competition

138) Each Defendant is a privately owned, for-profit business.

139) Defendants' primary sources of revenue are obtained by receiving payments

for advertising spots that appear above or along side their organic or map

search results.

140) The instant circumstances smack of fraud, deception, and unfair methods of

defendants artificially diluting their organic search results in order to collect

advertising revenue from both legitimate and illegitimate "scam" locksmiths

that Defendants know are a) unlicensed in states requiring licensing (Maryland

and Virginia), b) unregistered to do business in Washington DC, c)

misrepresent basic information such as their physical address, and d) are well-

documented by the media as fraudulent businesses.

# COUNT V - Breach of Contract

141) Plaintiff has contracted some of listed defendants for paid advertising services, typically paid for through a bidding system where business web sites bid on the amount they are willing to pay per potential customer's 'click through' on their advertisement on to the business website.

142) Defendants have knowingly invited competition for limited paid advertising space displayed to potential customers seeking locksmith services from advertisers they know are operating scam locksmith operations.

143) Defendants have knowingly invited competition for limited advertising spots from both legitimate and illegitimate "scam" locksmiths that plaintiff knows are a) unlicensed in Maryland or Virginia, b) unregistered to do business in Washington, D.C., c) misrepresent basic information such as their physical address, and d) are well-documented by the media as fraudulent businesses.

144) Defendants have invited such illegitimate locksmiths to compete for advertising space with legitimate locksmiths, for a profit motive.

145) Implied in every contract is an implied duty of good faith and fair dealing.  It is bad faith for Defendants to knowingly dilute the value of the advertising

paid for by Plaintiff by knowingly burying Plaintiff's listing under a large number of phony listings.

146) Plaintiff is aware the Defendants' advertising service is based on bid-per-click competition between legitimate competitors.  However, Defendants dilute the value of Plaintiff's advertising dollars paid to Defendants locksmiths by knowingly and deliberately allowing scam locksmiths to compete for the identical advertising positions sold to Plaintiff.

## COUNT VI -  Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

147) 15 U.S.C. § 1125(a)(1)(B) of the Lanham Act creates a private cause of action for use in commerce of any false or misleading description of fact in commercial advertising of goods and services that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

148) Defendants make false or misleading description of fact or representation of fact in a commercial advertisement about their [own or another's product by creating and publishing maps indicating locksmith businesses at locations at which Defendants are well aware are misrepresentations.

149) Defendants create false addresses for third-party businesses that are either different from those provided on third-party websites, or created them out of whole cloth where none were provided by third-party websites at all.

150) Defendants indicate on their own websites addresses and business locations for third-party locksmiths where no locksmith actually exists.

151) Defendants' misrepresentations are material and extremely pervasive.  It influences the decisions of many consumers regarding which locksmith to hire.

152) Defendants misrepresentation of the location and/or legitimacy of numerous scam locksmith businesses has deceived or has the tendency to deceive a substantial segment of its consumer audience.

153) Defendant have placed their misrepresentations in interstate commerce by publishing this information on the internet.

154) Plaintiff has been injured as a result of Defendants' misrepresentations by direct diversion of sales and by a lessening of goodwill associated with its products.

# COUNT VII - Conspiracy

155) Each and every defendant is well aware that they are aiding and abetting

nefarious locksmiths.

156) Defendants are well aware of the true identities of the individuals behind the

unlicensed, unregistered, or otherwise unlawful locksmith websites whose

listings they display in their organic search results.

157) Defendants are well aware of the true identities of the individuals behind the

unlicensed, unregistered, or otherwise unlawful locksmith websites whose

listings they display in their map search results.

158) Defendants are well aware of the true identities of the individuals behind the

unlicensed, unregistered, or otherwise unlawful locksmith websites whose

listings they display in their paid advertised results.

159) Defendants are aware of the identities of individuals behind these illegitimate

locksmith websites because they take their credit card and payment details in

order to collect payment for advertising.

160) Defendants have removed scam locksmith listings from their search engines

upon receiving notice.  However, their removal is disingenuous; as soon as one

fraudulent listing is removed, several more nearly identical websites published by the identical party are queued by the Defendant to take its place.

161) On information and belief, defendants continue posting advertisements without question or verification of basic information (such as the physical address of the listing) on behalf of parties that have had repeat take-down notices executed against their locksmithing websites.

162) Defendants have knowingly aided and abetted these fraudulent activities by creating content on their own Search Engine websites inducing consumers to believe that numerous business listings represent legitimate locksmiths, are reliable and can be relied on by consumers.

163) Scam locksmiths would be a trivial matter but for Defendants' deliberate creation of a forum in which they can freely operate.

164) Defendants have created this forum for scam locksmiths as a tool for maximizing their own profits by compelling legitimate locksmiths to buy advertising as a result of being obscured by the legion of scam locksmiths whose very existence is enabled by Defendants.

**WHEREFORE**, Plaintiff demands that this Court:

I.    Enter judgment against Defendants, jointly and severally, in equity, ordering:

a)   An injunction ordering Defendants to cease and desist publishing listings for

unlicensed locksmiths operating in geographic jurisdictions that require

locksmith licensing.

b)   An injunction ordering Defendants to cease and desist publishing map

pinpoints identifying locksmiths at locations where there is no locksmith.

c)   An injunction ordering Defendants to cease and desist publishing estimated

driving times and directions from and to map pinpoints identifying locksmiths

at locations where there is no locksmith.

d)   An injunction ordering Defendants to cease and desist publishing paid

advertisements for unlicensed locksmiths in jurisdictions requiring locksmith

licensing.

II.   Enter judgment at law against Defendants, jointly and severally:

a)   Awarding Plaintiff threefold damages per 15 U.S. Code § 15.

b)   Awarding Plaintiff actual damages in the amount of lost profits caused by

Defendants' tortious conduct.

c)   Awarding Plaintiff actual damages in the amount of lost good will and ongoing

client relationships caused by Defendants' tortious conduct.

d)   Awarding Plaintiff actual damages in the amount of lost good will and ongoing

client relationships caused by Defendants' tortious conduct.

e)   Awarding Plaintiff actual damages in the amount of lost publicity caused by

Defendants' tortious conduct.

f)   Awarding Plaintiff punitive damages for injuries caused by Defendants'

tortious conduct.

III.   Award Plaintiff attorney fees and the cost of this action.


# JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.
Dated this 2nd day of December, 2016.


Respectfully Submitted,

/s/ *Jeffrey Waintroob Roberts*
Jeffrey Waintroob Roberts, Esq.
DC Bar No.: 1007523
Email: Jeff@RobertsAttorneys.com
Barry Roberts, Esq.
DC Bar No.: 77990
Email: Barry@RobertsAttorneys.com
**Roberts Attorneys, P.A.**
4440 PGA Blvd., Suite 204
Palm Beach Gardens, FL 33410
TEL: (561) 360-2737
**Attorneys for Plaintiff**