# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

A BETTER CHOICE LOCK & KEY LLC
dba A Professional Locks
      940 N Alma School Rd. #112
      Chandler, AZ 85224

BALDINO'S LOCK & KEY SERVICE, INC.
      7000-G Newington Road
      Lorton, VA 22079

BERKELEY LOCK AND INSTITUTIONAL SUPPLY, INC.
dba BERKELEY LOCKSMITH
      121 College Park Road, Suite K
      Ladson, SC 29456

CLS LOCKSMITH LLC
dba CENTRAL SAFE AND LOCKSMITH CO.
      1107 7th St. N.W.
      Washington, D.C. 20001

DAWSON SAFE & LOCK SERVICES, INC.
dba DAWSON SECURITY GROUP, INC.
      26309 Interstate 45 North
      The Woodlands, TX 77380-1904

GRAH SAFE & LOCK INC.
      939 University Ave.
      San Diego, CA 92103

JOE EAST ENTERPRISES, INC.
dba A-1 LOCKSMITH
      2508 Highlander Way #230
      Carrollton, TX 75006

KEYWAY LOCK & SECURITY COMPANY INC.
dba KEYWAY LOCK & SECURITY INC.
      3820 W. 79th St.
      Chicago, IL 60652

MANK, INC.
dba POPALOCK OF BALTIMORE, MD
      9693 GERWIG LANE, SUITE E
      COLUMBIA, MD 21046

MANK LIMITED
dba POPALOCK OF WILMINGTON, DE
      4142 Ogletown Stanton Rd #230
      Newark, DE, 19713

MARSHALL'S LOCKSMITH SERVICE INC.
      4205 Poole Road
      Raleigh, NC 27610

MICHAEL X. BRONZELL
      9040 Meadowview Drive
      Hickory Hills, IL 60457

MRS. LOCKSMITH INCORPORATED
dba SANDY SPRINGS LOCKSMITH
      155 Hammond Drive
      Sandy Springs, GA, 30328

REDFORD LOCK COMPANY, INC.
      46085 Grand River Ave.
      Novi, Michigan, 48374

**for themselves and all others similarly situated,**
      *Plaintiffs*,
v.

GOOGLE INC.
1600 Amphitheater Parkway
Mountain View, CA 94043

      Service Address:
      GOOGLE INC.
      c/o Corporation Service Company
      1090 Vermont Ave. NW
      Washington, DC 20005

YAHOO! INC.
701 First Ave
Sunnyvale, CA 94089

Service Address:
     YAHOO! INC.
     c/o CT Corporation System
     1015 15th Street NW, Suite 1000
     Washington DC, 20005

MICROSOFT CORPORATION
Microsoft Headquarters
One Microsoft Way
Redmond, WA 98052

     Service Address:
     MICROSOFT CORPORATION
     c/o Corporation Service Company
     1090 Vermont Ave. NW
     Washington, DC 20005

     ***Defendants.***

_____/

# FIRST AMENDED COMPLAINT

Plaintiffs, on their own behalf and on behalf of the class they represent, ("Plaintiffs") file this First Amended Complaint per F.R.C.P. Rule 15 against Defendants Google, Inc., Yahoo! Inc., and Microsoft ("Defendants"), and allege:

## PARTIES

1) Plaintiff A BETTER CHOICE LOCK & KEY LLC dba A PROFESSIONAL LOCKS ("Better Choice") is an Arizona corporation providing locksmith and related security services.  Its principal place of business is: 940 N Alma School Rd. #112, Chandler, AZ 85224. Better Choice is registered to do business in Arizona.  Better Choice operates a website at: http://www.aprofessionallocks.com.

2) Plaintiff BALDINO'S LOCK & KEY SERVICE, INC. ("Baldino's") is a Virginia corporation providing locksmith and related security services. Its principal place of business

is 7000-G Newington Road, Newington, VA 22122.  Baldino's holds locksmith licenses in Maryland and Virginia and is registered to do business in the District of Columbia. Baldino's operates eleven store locations in Virginia and four in Maryland that service the DC Metro area. Baldino's operates a website at: http://www.baldinos.com.

3)   Plaintiff BERKELEY LOCK AND INSTITUTIONAL SUPPLY, INC. dba BERKELEY LOCKSMITH ("Berkeley") is a South Carolina corporation providing locksmtih and related security services.  Its principal place of business is: 121 College Park Road, Suite K, Ladson, SC 29456. Berkeley is registered to do business in South Carolina.  Berkeley operates a website at: http://berkeleylocksmith1.wixsite.com/berkeleylocksmith.

4)   Plaintiff CLS LOCKSMITH LLC, dba CENTRAL SAFE AND LOCKSMITH CO. ("CLS"), is a D.C. Limited Liability Company providing locksmith and related security services.  Its principal place of business is 1107 7th St. N.W., Washington, D.C. 20001. CLS is registered to do business in Washington D.C. CLS operates a website at: http://www.centralsafeandlock.com.

5)   Plaintiff DAWSON SAFE & LOCK SERVICES, INC., dba DAWSON SECURITY GROUP, INC. ("Dawson") is a Texas corporation providing locksmith and related security services.  Its principal place of business is: 26309 Interstate 45 North, The Woodlands, TX 77380-1904. Dawson is a Texas licensed locksmith.  Dawson operates a website at: http://dawsonsafeandlock.com.

6)   Plaintiff GRAH SAFE & LOCK INC. ("GRAH") is a Californian corporation providing locksmith and related security services.  Its principal place of business is: 939 University Ave. San Diego, CA 92103.  GRAH is a California licensed locksmith.  GRAH operates a website at: http://www.grahsecurity.com.

7)   Plaintiff JOE EAST ENTERPRISES, INC., dba A-1 Locksmith (Joe East) is a Texas

corporation providing locksmith and related security services.  Its principal place of

business is: 2508 Highlander Way #230, Carrollton, TX 75006.  Joe East operates ten retail

store locations in the Dallas/Fort Worth area in Dallas County, Collin County, and Tarrant

County.  Joe East is licensed under the locksmith licensing code of Texas.  Joe East operates

a website at: http://www.a-1locksmith.com.

8)   Plaintiff KEYWAY LOCK & SECURITY COMPANY INC. dba KEYWAY LOCK &

SECURITY INC. ("Keyway") is an Illinois corporation providing locksmith and related

security services.  Its principal place of business is: 3820 W. 79th St. Chicago, IL 60652.

Keyway operates two retail store locations in the Chicago area.  Keyway is licensed under

the locksmith licensing code of Illinois.  Keyway operates a website at: http://

keywaychicago.com.

9)   Plaintiff MANK, INC. dba POPALOCK OF BALTIMORE, MD ("Popalock MD") is a

Maryland corporation providing locksmith and related security services.  Its principal place

of business is: 9693 Gerwig Lane, Suite E, Columbia, MD 21046.  Popalock MD operates a

website at: http://www.popalockbaltimoremd.com.

10)  Plaintiff MANK LIMITED dba POPALOCK OF WILMINGTON, DE ("Popalock DE"), is

a Delaware Corporation providing locksmith and related security services.  Its principal

place of business is: 4142 Ogletown Stanton Rd #230, Newark, DE, 19713.  Popalock DE is

registered to do business in Deleware.  Popalock DE operates a website at: http://

www.popalock.com/franchise/wilmington-de/locksmith-home.

11)  Plaintiff MARSHALL'S LOCKSMITH SERVICE INC. ("Marshall's") is a North Carolina

Corporation providing locksmith and related security services.  Its principal place of

business is: 4205 Poole Road, Raleigh, NC 27610. Marshall's is licensed under North

Carolina's locksmith licensing statute.  Marshall's operates a website at: http://

www.marshallslocks.com.

12) Plaintiff MICHAEL X. BRONZELL operates a locksmith business in Chicago, Illinois as a

sole proprietor providing locksmith and related security services.  His principal place of

business is: 9040 Meadowview Drive Hickory Hills, IL 60457. Mike Bronzell is an Illinois

licensed locksmith.

13) Plaintiff MRS. LOCKSMITH INCORPORATED, dba SANDY SPRINGS LOCKSMITH

("Sandy Springs") is a Georgia Corporation providing locksmith and related security

services.  Its principal place of business is: 155 Hammond Drive, Sandy Springs, GA,

30328.  Sandy Springs operates one retail store location in the Atlanta metro area. Sandy

Springs is registered to do business in Georgia.  Sandy Springs operates a website at: https://

sandyspringslocksmith.com.

14) Plaintiff REDFORD LOCK COMPANY, INC. ("Redford") is a Michigan corporation

providing locksmith and related security services.  Its principal place of business is: 46085

Grand River Ave. Novi, Michigan, 48374.  Redford is registered to do business in Michigan.

Redford operates one retail store location in the Detroit metro area.  Redford operates a

website at: http://www.redsafelock.com.

15) Defendants are internet-based information content organizers and creators ("Search

Engines").  Internet search engines provide a unique service to customers and are a relevant

market for antitrust analysis.  This market is dominated by Defendants.

16) The relevant market of internet search is highly distinct because of its immediacy and the unique ability it grants of consumers to access specific information quickly via computer or hand-held device.

17) Google Inc. operates a Search Engine at: www.google.com.

18) Google Inc. is incorporated in Delaware and has its principal place of business in California.

19) Yahoo! Inc. (yahoo.com) operates a Search Engines at: www.yahoo.com.

20) Yahoo! Inc. is incorporated in Delaware and has its principal place of business in California.

21) Microsoft Corporation operates a Search Engine at: www.Bing.com.

22) Microsoft Corporation is a Washington State corporation and has its principal place of business in Washington.

# JURISDICTION

25) This Court has jurisdiction under 28 USC § 1331, federal rights of action because this action includes claims for unlawful abuse of monopoly power, 15 U.S.C. § 15, and false designation of origin of services under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

26) Venue is appropriate in this Court under 28 USC § 1391 because some Plaintiffs do business in the District of Columbia, Plaintiff CLS is both incorporated in the District of Columbia and maintains its corporate headquarters in the District of Columbia, and all defendants conduct business in the District of Columbia.

27) This Court has personal jurisdiction over each and every defendant per the District of Columbia Long-Arm Statute, D.C. Code Ann. § 13-423, because each and every defendant: a) contracts to supply services in the District of Columbia, b) has caused tortious injury to Plaintiff in the District of Columbia by acts or omissions outside the District of Columbia while regularly doing and soliciting business, engages in persistent advertising within the

District of Columbia, and/or derives substantial revenue from services rendered in the

District of Columbia;

# FACTS COMMON TO ALL COUNTS

## I.  DEFENDANTS' MONOPOLY POWER

28)  Internet search is the primary avenue through which prospective customers seek locksmiths.

29)  Consumer Internet Search in the United States constitutes a unique and relevant market

without meaningful substitutes.

30)  Approximately 70% of all organic internet search queries conducted in the United States are

done on search engines controlled by Google Inc. ("Organic" search results are the unpaid

list of links displayed by search engine defendants, ordinally ranked by their respective

"relevancy" to a consumer's search term).

31)  Approximately 20% of all organic internet search queries conducted in the United States are

done on search engines controlled by Microsoft Corporation.

32)  Approximately 12% of all organic internet search queries conducted in the United States are

done on search engines controlled by Yahoo! Inc.

33)  Defendants together control approximately 90% of organic and map internet search

originating in the United States.

34)  Defendants have market power over the relevant market comprised of domestic search

engines.

35)  Defendants knowingly and deliberately flood organic search results displayed in response to

queries such as "locksmith" (and related terms) with scam locksmith listings they know: 1)

do not exist at all, or at least not at the locations indicated, 2) operate for the purpose of defrauding the consumer public, 3) are not licensed in jurisdictions mandating locksmith licensing, 4) are unregistered to do business in jurisdictions (such as DC) requiring business registration.

36) Defendants flood the market with fictitious listings to dilute Plaintiffs' and other legitimate locksmiths' listing in the organic and map results to the point of obscurity, thereby compelling legitimate locksmiths to pay Defendants for paid advertised results merely to be seen by the same prospective customers.

37) Consumers' ability to discover and contact Plaintiffs and other legitimate locksmiths has been severely restricted by Defendants' conduct because Defendants control essentially the entire internet search industry.

38) Defendants are able to genuinely thwart the general consumer public from prospective business relationships with Plaintiffs and other legitimate locksmiths because they have market power over the internet search industry.

39) Defendants are all on actual notice that they are listing numerous fraudulent, fictitious, or otherwise phony listings, and that such listings directly harm legitimate locksmiths represented by Plaintiffs.

40) Defendants use their dominance of the relevant market to extract monopoly profits.

41) Defendants abuse their market power over organic and map internet search to manufacture otherwise non-existing demand for paid advertised search results.

42) Plaintiffs have lost 30-60% of their gross revenue since 2009 in the specific business arena of outbound consumer service calls.  A large number of formerly viable locksmiths have been put out of business entirely as a direct result of Defendants' actions.

43) Plaintiffs have lost approximately 25% of their gross revenue since 2009 as a direct result of Defendants' conspiracy and abuse of monopoly control over the internet search industry.  In the case of Plaintiff Baldino's alone, this amounts to over $1 million per year.  Larger operations, such as Baldino's, have been typically less impacted than smaller operations and sole proprietor/operators because large locksmith operations typically have a portion of their business dealing with institutional, government, and large corporate accounts that are less vulnerable to internet fraud.

44) Abuse of market power is a Federal Crime under 15 U.S. Code § 2.

45) Conspiracy in restraint of trade or commerce is a Federal Crime under 15 U.S. Code § 1.

46) Google Inc.'s abuse of monopoly power has been well established in an August 8, 2012 report, Subject matter: Google Inc., File No. 111—163, officials at the Federal Trade Commission recommended an antitrust lawsuit against Google.  On page 116 of their 160 page report, officials at the Federal Trade Commission concluded :

> *"Google's conduct has resulted — and will result — in real harm to consumers and to innovation in the online search and advertising markets.  Google has strengthened its monopolies over search advertising through anticompetitive means, and has forestalled competitors' and would-be competitors' ability to challenge those monopolies, and this well have lasting negative effects on consumer welfare.  Specifically, the Staff believes that:*
>
> > *1.        Google has unlawfully maintained its monopoly over general search and search advertising, in violation of Section 2, or otherwise engaged in unfair methods of competition, in violation of Section 5, by scraping content from rival vertical websites in order to improve its own product offerings.*
> >
> > *2.     Google has unlawful maintained its monopoly over general search, search advertising, and search syndication, in violation of Section 2, or otherwise engaged in unfair methods of competition, in violation of Section 5, by entering into exclusive and highly restrictive agreements with web publishers that prevent publishers from displaying competing search results or search advertisements.*
> >
> > *3.     Google has unlawfully maintained its monopoly over general search and search advertising, in violation of Section 2, or otherwise engaged in unfair methods of competition, in violation of Section 5, by maintaining*

*contractual restrictions that inhibit the cross-platform management of advertising campaigns.*

47) A 2015 article in the Wall Street Journal explains "Officials at the Federal Trade Commission concluded in 2012 that Google Inc. used anticompetitive tactics and abused its monopoly power in ways that harmed Internet users and rivals, a far harsher analysis of Google's business than was previously known… …The 160-page critique, which was supposed to remain private but was inadvertently disclosed in an open-records request, concluded that Google's 'conduct has resulted—and will result—in real harm to consumers and to innovation in the online search and advertising markets.'"

48) FTC commissioners went against staff recommendations and declined to take action against Google Inc.

## II.  SCAM LOCKSMITHS

49) Consumers generally prefer dealing with nearby locksmiths.  This is especially true when seeking a locksmith for an emergency situation, such as where a consumer is locked out of his or her home or car.

50) Locksmithing is a licensed profession in: Alabama, California, Connecticut, Illinois, Louisiana, Maryland, Nebraska, New Jersey, Nevada, North Carolina, Oklahoma, Oregon, Tennessee, Texas, and Virginia.  The City of New York, NY, Nassau County, NY, and Miami-Dade County, FL and Hillsborough County, FL also have locksmith licensing ordinances.

51) The identities, addresses, and phone numbers of licensed locksmiths in jurisdictions that require locksmith licensing is a matter of public record, freely accessible to Defendants.

52) Locksmiths doing business in the District of Columbia, and most other jurisdictions, are required to register for a business license.  Code of the District of Columbia § 47–2851.03d.

53) Most consumers do not have an ongoing relationship with a locksmith.

54) Location-based internet search (through cell phone or personal computer) is the primary means by which prospective customers seek locksmith services, especially for emergency lock-out situations.

55)  Consumers needing emergency locksmith services are vulnerable to locksmith scams. Addressing this consumer vulnerability is one of the primary purposes of locksmith licensing.

56) Numerous companies and individuals that hold themselves out as locksmiths operate with intent to defraud the public.  These fraudsters are widely known as "scam locksmiths".

57) Scam locksmiths publish hundreds or thousands of unique websites targeting nearly every heavily populated geographic location all around the country.  They misrepresent their services offered, pricing, expertise, training, who is behind the website, their location, contact information, and whether they are licensed or registered to do business.

58) Scam locksmiths' websites display either a fictitious or no address, and include false claims that they are local businesses with local phone numbers.  They do this deliberately, to misrepresent themselves to consumers as nearby businesses.

59) When a user calls the local-area phone number for the scam locksmith, he or she may be put through to a call center, in another city or even another country.  An operator sends over a putative "locksmith" on behalf of the scam company.

60) The scam-locksmith usually lacks the experience and specialized tools needed, typically tells the customer the problem is worse than expected and takes some drastic, destructive action (like drilling out the caller's lock).  He then demands immediate payment in cash only for many times the expected bill.

61) Scam locksmithing is a well-documented and widespread consumer fraud:

    A. The Federal Trade Commission has issued consumer warnings regarding fraudulent locksmiths.  *See*: https://www.consumer.ftc.gov/articles/0089-finding-locksmith.

    B. Numerous media reports on major network television, respected news publications such as The New York Times, and numerous consumer groups have documented and reported the scam locksmith problem and Defendants' participation therein. Consumer Reports, the nation's leading not-for-profit consumer advocacy organization, has published articles regarding locksmith scams appearing on google.com: "Companies listed in Google's results in the area reserved for local services companies are actually call centers, that may be out of state or even in a different country. These businesses are known as lead generators, or lead gens, that have tricked Google into displaying them as physical stores in their neighborhoods, when in reality, they're ghosts. Customers get a quote for around $35-$90, but when the subcontractors show up, they often demand much more money for their services, sometimes all in cash."  The same report suggests that google.com is fully aware of the nation-wide scam problem and is doing little to address the issue. *See*: https://consumerist.com/2016/02/01/4-things-we-learned-about-fake-locksmith-scammers-lurking-online/

### III.  SCAM LOCKSMITHS ARE ENABLED BY DEFENDANTS' ABUSE OF MONOPOLY POWER

62)  Defendants publish at least three categories of material: a) Third-party content that

Defendants have used to abuse their monopoly power, b) Defendants' original content,

created out of whole cloth, and c) Enhanced content that was derived from third-party

content, but has been so augmented and altered as to have become new content and not mere

editorialization.

63)  Defendants publish third-party websites created by scam locksmith that Defendants know

do not exist at the addresses stated thereon, and which they know exist for the purpose of

defrauding the consumer public.

64)  Addresses listed by Defendants are often different than those listed on third-party scam

locksmiths' linked-to websites or do not appear on the linked-to websites at all.  These

fictitious addresses are Defendants' own original content, displayed on their own websites,

and have no third-party origin.

65)  Defendants publish these third-party websites in sufficient quantities on their organic and

map results to severely bury and obscure legitimate locksmith businesses such as Plaintiff

from prospective customers.

66)  Defendant Search Engines deliberately flood their own organic and map results with

locksmith listings they know are seriously inaccurate or even nonexistent to induce both

legitimate and scam locksmiths to participate in paid results to overcome the false

information.

67) Scam locksmiths promote themselves almost exclusively on the internet and are fundamentally dependent on Defendant search engines to obtain exposure to prospective customers. The have almost no exposure to print, television, billboard, or other traditional media because state regulations do not allow those publishers to run advertisements and post other public notifications for unlicensed, unregistered, or otherwise identifiably unethical businesses such as these.

68) Instead, scam locksmiths exist only in and because of the space created for them by Defendants, who together control nearly all of the consumer public's access to internet websites.

69) But for Defendants' willful, knowing, and abusive promotion of scam locksmiths, scam locksmithing would be reduced to a trivial matter.

70) Defendants have deliberately created an environment in which unlicensed, unregistered, and otherwise scam locksmiths can exist by abusing their monopoly control of internet search.

71) Scam locksmiths could not operate without the knowing assistance of Defendant Search Engines.

72) Defendants are well aware of both this scam-locksmith problem and their own roles in enabling these scam locksmiths to operate.

73) Defendants deliberately use links and map results displaying fictitious locations of scam locksmiths to aggressively manufacture demand for their own paid advertised results that would not exist but for their abuse of their monopoly control of internet search and conspiracy to both permit scam locksmith results and create locksmith addresses they know are fictitious, misleading, or otherwise fraudulent.

74) Defendants deliberately bury legitimate locksmiths such as Plaintiffs under a long list in their organic results, or within a large cluster of map pinpoints (created by Defendants) that putative locksmiths Defendants knows are scam operations that do not exist at those addresses.  Defendants do this in order to compel both the legitimate and scam locksmiths to pay for advertising positions in Defendants' paid results that locksmiths (including Plaintiffs) would otherwise not purchase at all.

75) Defendants bury legitimate locksmith listings (such as Plaintiffs') in their organic and map listings to oblige them to pay more than they otherwise would have paid in order to be seen by prospective consumers.

## IV.  DEFENDANTS' ORIGINAL CONTENT ENABLES, LEGITIMIZES, AND MATERIALLY CONTRIBUTES TO SCAM LOCKSMITHS' FRAUD

76) Defendants not only publish links to websites of scam locksmiths, they also enhance those listings on their own search engine websites by creating brand new original content not found on the original web sites.

77) Defendants create and display brand new original content related to scam locksmith listings and display their content on Defendants' own search engine websites to enhance their own search result products.  Defendants' original content appears nowhere else on the internet, originates solely from Defendant search engines, and appears exclusively on Defendants' websites or on third party websites authorized by Defendants to republish Defendants' proprietary content.

78) Defendants' original content materially enhances the ability of scam locksmiths to deceive the public.

79) Defendants' original content lends scam locksmiths the appearance of legitimacy.

80) The majority of Defendants' organic search results in the United States for 'locksmith' and related queries are scam locksmith listings.

81) The majority of Defendants' map search results in the United States for 'locksmith' and related queries are scam locksmith listings.

82) The majority of Defendants' paid search results for 'locksmith' and related queries are scam locksmith listings.

83) Defendants display geographically targeted paid search results alongside their organic results and map results. These paid search results are Defendants' primary source of business revenue.

84) Defendants are on actual notice that they are displaying organic, map, and paid search results for unlicensed locksmiths in jurisdictions requiring licensing.

85) Maryland Code §12.5–401 requires that: "Each locksmith advertisement, business card, or any other means of providing notice to the public of the business providing locksmith services shall include the name of the licensed locksmith and the license number of the licensed locksmith."

86) Every jurisdiction in the United States requiring licensing has some provision analogous to Maryland's that addresses and bans unlicensed locksmith advertisements and public notices.

87) Defendants display locksmith advertisements and multiple other types of notices to the public that do no include the name and license number of the locksmith, in violation of the laws of jurisdictions requiring such notice.

88) The exact identity, location, license number, and contact information of each locksmith in a jurisdiction requiring licensing (see paragraph 50 above) is a matter of public information and is published by the government of that jurisdiction.

89) The identity of all locksmiths registered to do business in the District of Columbia is a matter of public knowledge, freely available to Defendants, because all businesses must register with the DC government.

90) The District of Columbia government publishes a list of registered businesses on the internet at: https://eservices.dcra.dc.gov/BBLV/Default.aspx

91) States and other jurisdictions in the United States have an internet database analogous to the District of Columbia's that is available to the public that lists businesses registered to do business in that jurisdiction.

92) Displaying advertisements or other notices on behalf of an unregistered DC business is unlawful. Every jurisdiction in the United States has analogous laws proscribing advertising of unregistered businesses.

93) Defendants display numerous advertisements and other public notifications for unregistered DC locksmith in violation of DC law, and do the same in other jurisdictions in violation of law.

94) Defendants' original content includes fictitious addresses, photos, map locations, and map pinpoints for scam locksmiths as well as driving directions to and from the fictitious locations.

95) Defendants claim copyright protection for their newly created content related to parties they know are scam locksmiths because it does not originate from a third-party.

96) The Defendants' original content does not appear anywhere on the internet except on Defendants' own websites and on websites contractually authorized by Defendants to republish the Defendants' content via RSS feed.

97) This newly created content is published on defendant's search-engine websites separately and independently from content culled from scam locksmiths' websites.

98) Defendants' original content independently and deliberately deceives consumers beyond the original deception purveyed by the scam locksmiths themselves.

99) For example, Defendants independently determine the location of a requesting consumer, then create and publish non-interactive maps which purport to show locksmiths' locations in relation to the consumer's location.

100) The Defendants' original content is not interactive and can not be altered or edited by anyone but the Defendants.

101) Paid results and organic results are displayed side-by-side on the same webpage, as are paid results and map results.

102) Paid results are displayed only to users in specific geographic areas, like map results.

103) Defendants' algorithms organize their organic results by factoring in the geographic proximity of each search result to the quarrying user, with the same geographically

restrictive result as an outright map search because consumers only shown organic results one page at a time, and there only see the first (approximately) ten of what are typically millions of organic search results.

104) Approximately 90% of search engine users do not look beyond the first page of organic search results.

105) Each page of Defendants' organic search results display about ten individual listings.

106) Defendants' publication on their own websites of their own original content related to scam locksmith listings has destroyed Plaintiff's good will in the minds of the consumer public.

107) Defendant Search Engines unlawfully facilitate, enhance, and legitimize scam locksmith services.

## V.  DEFENDANTS' ALGORITHMS: TOOLS OF ABUSE

108) Defendants' claim to use mathematical algorithms to automatically sort, categorize, and ordinally rank websites according to Defendants' opinion of their "relevancy" to a consumer's specific search term in a specific geographic area.

109) Defendants' algorithms primary purpose is to directly maximize profits.  The algorithms' secondary purposes are to gain users by optimizing Defendants' search results so that more customers use their services more of the time.

110) One of the ways that Defendants' algorithms are used to maximize Defendants' profits is by rewarding websites whose owners post generate profit for Defendants in unrelated areas, such as by posting popular videos in youtube.com (controlled by another subsidiary of Google Inc.'s parent company) even though there is no logical correlation between the

'relevance' of a given poster's Youtube videos to the 'relevance' of print content displayed on that same user's internet website.

111) Defendants' algorithms organize, rank, categorize, correlate, and display results for organic, map, and paid results.  Optimizing each category of search results to maximize profit for Defendants is the primary objective of each Defendant's proprietary algorithm.

112) For example, Defendants' algorithms consider a website's participation in paid advertised search results in determining their ordinal ranking in their organic and map results.

113) Defendants' algorithms reward websites that pay Defendants for advertising by advancing them in the organic results ahead of websites that do not pay Defendants for positions in the paid results.

114) Correspondingly, Defendants' algorithms demote websites in the ordinal organic search ranking based on their non-participation in Defendants' paid advertising.

115) Defendants algorithmic results are designed to maximize their own profit from paid advertisements by penalizing non-payers with demotion in Defendants' organic results and promoting websites in their organic result who pay them in the paid results.  The degree or promotion and demotion in the organic results based on payment for paid results is a fundamental part of the Defendants' algorithm, whose entire purpose is to maximize Defendants' profits.

116) Defendants manually alter their own algorithmic results to maximize profitability of correlated paid advertisements.  Their manual manipulation factors in inputs to influence and maximize their profitability by inducing website owners to participation in paid advertised search results.

117) Defendants' algorithms are created to maximize Defendants' profits by flooding their own organic and map results for 'locksmith' and related queries with results they know or should know are unlicensed, unregistered, or do not exist at addresses indicated by those websites or at addresses created by Defendants themselves.

118) Defendants have the technological ability to automatically verify the accuracy of locksmith locations, licensing, and other critical details, but deliberately avoid applying this technology.  For example, Defendants could use similar technology used to flag images of child pornography to flag listings at addresses where their own 'street view' photographic images (displayed alongside Defendants' map listings) clearly do not display retail locksmith shops at the addresses at which Defendants indicate they exist.

## VI.  DEFENDANTS' BAD FAITH

119) Many Plaintiffs have paid Defendants for a link to their website to appear in Defendants' paid search results.

120) Plaintiffs' websites' listings are buried underneath hundreds (or even thousands) of organic, paid, and map listings of companies that Defendants' search engines and directory services are fully aware do not actually exist.

121) Because Plaintiffs' listings are buried in Defendants' search results, they are obliged to pay Defendants for advertising to obtain customers.

122) Defendants have knowingly diluted the value of Plaintiffs' paid advertisements by deliberately allowing illegitimate locksmiths to occupy the same paid advertising spots, typically through a bid-for ordinal position system.

123) Defendants knowingly dilute the value of Plaintiffs' paid advertisement in order to induce Plaintiffs to overpay for advertising, simply to be seen by the same prospective customers that would have seen him in Defendants' organic and map results, but for Defendants' crowding him out with scam listings.

## VII.  DEFENDANTS ARE ON NOTICE

124) Defendants have received numerous notices that they are publishing listings for locksmiths with fake addresses or fake contact information.

125) Defendants have received numerous notices that they are publishing listings for unlicensed locksmiths every jurisdiction requiring locksmith licensing.

126) Defendants are on actual notice that they are publishing listings for unlicensed locksmiths in every jurisdiction that requires locksmith licensing.

127) Defendants are on actual notice that the great majority of results they post for queries to 'locksmiths' (and related queries) conducted in DC, and the majority of other jurisdictions requiring business registration but not locksmith licensing, are not registered with the government of that jurisdiction to do business.

128) Defendants are on actual notice that the great majority of results they post for queries relating to 'locksmiths' conducted in Maryland, Washington DC, and Virginia, and the majority of other urban or suburban areas in the United States do not exist at the physical street addresses at which the defendant Search Engines and Directories indicate they exist.

129) Plaintiffs have lost tremendous and valuable good will in the community and been confused by the public with scam locksmiths as a direct result of Defendants' wrongful actions.

# VIII.  CLASS ACTION ALLEGATIONS

122) Plaintiffs bring this class action under F.R.C.P Rule 23(b)(3).

123) Plaintiffs seek certification of the following class, composed of three plaintiff subclasses per

F.R.C.P. Rule 23(c)(5) :

    A.  All retail locksmith businesses operating in compliance with the locksmith

        licensing law of their jurisdiction in United States jurisdictions that require

        locksmith licensing.  Members of this subclass are represented by Plaintiffs: a)

        Baldino's — regarding its operations in Maryland and Virginia, b) Joe East, c)

        Dawson, d)  Grah, e) Keyway, f) Popalock MD, and g) Marshall's.

    B.  All retail locksmith businesses with physical retail store locations lawfully

        operating in the United States under the laws of their respective jurisdiction, not

        included in subclass "A" above.  Members of this class are represented by

        Plaintiffs: a) CLS, b) Sandy Springs, c) Redford, and d) Berkeley Locksmith.

    C.  All locksmith businesses or business owners on behalf of their businesses, that are

        members of recognized national or regional trade associations comprised primarily

        of locksmiths not included in subclasses "A" or "B" above.  Members of this class

        are represented by Plaintiffs: a) Better Choice, b) Baldino's — regarding its District

        of Columbia operations, c) Popalock DE, and d) Michael X. Bronzell

124) The class and each subclass is so numerous that joinder of all members is impractical. While

the exact number and identity of class members is unknown to the plaintiffs at this time and

can only be ascertained through appropriate discovery, the plaintiffs believe that the number

of class members is approximately 3,000.  The precise number and identification of the class

members will be ascertainable from the government records of the fifty states, DC, and other US territorial jurisdictions in which the plaintiff classes operate their businesses.

125) The questions of law and fact set forth in this complaint are common to all members of the class.  Indeed, the essence of this complaint addresses Defendants' actions which by definition impact every legitimate participant in the U.S. retail locksmithing industry. Those common questions include, but are not limited to:

(i) Has Defendants' abuse of their monopoly control over internet search damaged Plaintiff Class Members?

(ii) What is the measure of damages for Defendants' abuse of their monopoly power?

(iii) Has Defendants' original content damaged Plaintiff class members?

126)  The plaintiffs' claims are typical of the claims of the class because they, like the class members, are lawful market participants who operate websites designed to engage prospective customers and Defendants have abused their monopoly power to deliberately disrupt, interfere, and obscure their websites in a manor not substantially different than any other member of the class.

127) Plaintiffs will fairly and adequately protect the interests of the class because each of them operates a physical retail locksmith store location, is licensed in a jurisdiction requiring licensing, or is a member of a national, regional, or local locksmith trade association that screens and carefully vets its members.  None of their interests conflict with the interests of the class.

128) Plaintiffs have obtained counsel with extensive experience in Federal Litigation in matters involving analogous business disputes.  Plaintiffs' counsel has extensive industry experience

working with locksmiths and related security matters and serves as general counsel to ALOA

Security Professionals Association, Inc., the leading international trade association for

locksmiths.

129) The questions of law or fact common to the members of the class predominate over any

questions affecting only individual members, and a class action is superior to other available

methods for fairly and efficiently adjudicating the plaintiffs' claims. Joinder of all members is

impracticable. Furthermore, because the injury suffered by the individual class members may

be relatively small, the expense and burden of individual litigation make it impossible for

members of the class to individually redress the wrongs done to them. There will be no

difficulty in the management of this action as a class action.


## COUNT I - Abuse of Monopoly Power

130) Defendants have violated 15 U.S. Code § 2 by abusing their monopoly power over organic

and map internet search.

131) Defendants knowingly and deliberately bury Plaintiffs and other legitimate locksmiths

similarly situated under a large number of results they know are: a) Located in jurisdictions

that require locksmith licensing, but are unlicensed, b) Located in jurisdictions such as

Washington, D.C and other jurisdictions requiring business registration, but unregistered in

that jurisdiction, c) Do not exist at the addresses indicated by the linked-to website, d) Do

not exist at addresses created by Defendants and indicated by the Defendants on their own

search-engine websites, or e) Are otherwise known to Defendants as scam locksmiths whose

intent is to defraud the consumer public.

132) The need to compete with organic listings by paying for advertising spots alongside the organic listings is artificially manufactured by the defendants by listing large numbers of artificial listings in their organic results, burying the authentic listings.

133) Defendants knowingly and deliberately flood their organic and map results with fake listings in order to induce legitimate locksmiths to pay them for advertising spots.

134) Many of Defendants' fake map listings are Defendants' own original content in which Defendants' hold copyright and license to other third parties to republish.

135) Defendants' market power allows them to unlawfully manipulate the relevant market.

136) Defendants have abused their monopoly power to compel Plaintiffs and others similarly situated to pay them for advertising positions they would otherwise not purchase.

137) Defendants have abused their monopoly power to compel Plaintiffs and others similarly situated to pay them an unreasonably high amount for advertising positions.

138) Plaintiff's business has been harmed as a direct result of Defendants' abuse of monopoly power.

139) The Sherman Act statute of limitations should be tolled and extended significantly because Plaintiffs were not aware of or understand Defendants' abuse of monopoly power until recently.

## COUNT II - Conspiracy in Restraint of Trade

140) Defendants' economic incentive for knowingly publishing fake listings is simple: On one hand, Defendants earn substantial revenue from both legitimate and scam locksmiths forced to pay them for advertising spots to overcome an artificially crowded and obscure position in

Defendants' organic and map results.  On the other hand, enforcing accurate locksmith listings would cost them money out-of-pocket, with the result of reducing their own advertising revenue (by deleting the great majority of their locksmith listings).

141) The implicit and explicit agreements between Defendants and scam locksmiths constitute a contract, combination, or conspiracy.

142) Defendants also impliedly agree with one another to flood listings with phony locksmith with the understanding that it will increase profits for all Defendants.

143) Defendants have violated 15 U.S. Code § 1 by cooperating with scam locksmiths in restraint of trade.

144) By cooperative agreement to permit locksmith listings they know are fraudulent, Defendants both avoid the cost of regulating their own product while increasing profits.  Defendants avoid costs and increase advertising revenue at the direct expense of legitimate retail locksmiths.

145) If any one of the Defendants were to break with their agreement, the other two would be compelled to regulate their search result products as well because one of the Defendants would have publicly shown that accurate listings are feasible.  By conspiring to allow fraudulent locksmith listings, the problem appears internet-wide and insurmountable, all while maximizing all Defendant conspirators' profits.

146) Defendants' conduct results in direct harm to consumers.

## COUNT III - Common Law Fraud

147) Defendants have represented that their organic and map results are accurate, legitimate, and lawful.  This representation is false and deceptive.

148) Defendants have represented that the paid advertisement spots they display alongside their organic and map results are a scarce and valuable commodity because of the authentic shortage of prime (i.e. first page) listing space in the organic results.  This representation is false and deceptive.

149) The scarcity of prime listing space for locksmiths is due to Defendants' knowing publication of fictional or unlawful listings.

150) There are only a handful of locksmiths in many geographic areas, such as Washington DC, where there is room for every single legitimate locksmith business registered to do business in Washington DC to appear on the first page of organic or map queries seeking locksmiths in Washington DC.

151) Defendants' creation of original content (such as, but not limited to addresses not appearing on third-party websites) has materially created a sense of legitimacy for scam locksmiths in the minds of consumers and thereby directed prospective customers away from Plaintiffs' businesses.

152) Defendants' creation of original content (such as, but not limited to street addresses not appearing on third-party websites) has materially contributed to obscuring Plaintiffs' listing in both Defendants' organic and map results.

153) Defendants create original content to enhance third-party scam listings for the explicit purpose of burying legitimate businesses such as Plaintiffs' in a pile of fake listings.

154) Defendants bury legitimate businesses such as Plaintiffs' to artificially create competition for paid advertising spots amongst locksmiths such as Plaintiffs' seeking merely to be seen by the same prospective customers they would be seen by but for Defendants' actions.

155) Manufacturing artificial demand for advertising spots is an explicit, deliberate part of the defendant's business plan.

156) Defendants' manufactured demand is material.  Were Plaintiffs to decline to pay for advertising, their businesses would be buried under fake, unlawful, or deliberately misleading organic and map results to the point of obscurity.

157) Defendants intend that Plaintiffs pay for advertising to overcome this manufactured demand.

158) Defendants earn the vast majority of their profits through internet listings.  Inducing business to pay them for listings to overcome obscurity in Defendants' organic and map results is the thrust of their entire business model.

159) Plaintiffs were not aware that Defendants were using fake organic listings to create demand for the paid advertising spots he paid for.

160) Plaintiffs were not aware that Defendants were using fake organic listings to drive up the price of the advertising spots he paid for.

161) Instead, Plaintiffs relied on Defendant's good names and assumed that their business practices were both legitimate and forthright.


## COUNT IV - Tortious Interference with an Economic Advantage

156) Plaintiffs obtain customers through each of the defendant search engine and directory services.

157) Plaintiffs' businesses can not be seen by prospective consumers because Defendants display unlicensed, unregistered, inaccurate, or otherwise unlawful listings that block customers from seeing Plaintiffs' listing, causing him to lose business.

158) Each and every Defendant is on actual notice that their conduct is interfering with Plaintiffs' ability, and the ability of other legitimate locksmiths, to reach potential customers.

159) Plaintiffs have reasonably anticipated business expectancies of significant economic value that are being thwarted and directed away from Plaintiffs by Defendants' actions.

160) Defendants' actions are both inducing and causing an actual breach in the Plaintiffs' expectant customers from contacting him for locksmith and related security business.

161) Plaintiffs have suffered a loss in business volume, a loss in business revenue, and damage to his good will and trade name as a direct result of defendants' tortious interference.


## COUNT V - Unfair Competition

162) Each Defendant is a publicly traded, for-profit business.

163) Defendants' primary sources of revenue are obtained by receiving payments for advertising spots that appear above or along side their organic or map search results.

164) The instant circumstances smack of fraud, deception, and unfair methods of defendants artificially diluting their organic search results in order to collect advertising revenue from both legitimate and illegitimate "scam" locksmiths that Defendants know are a) unlicensed in jurisdictions requiring licensing such as Maryland and Virginia, b) unregistered to do business in jurisdictions requiring business registration, such as Washington DC, c) misrepresent basic information such as their physical address, and d) are well-documented by the media as fraudulent businesses.

# COUNT VI - Breach of Contract

165) Plaintiff has contracted some of listed defendants for paid advertising services, typically paid for through a bidding system where business web sites bid on the amount they are willing to pay per potential customer's 'click through' on their advertisement on to the business website.

166) Defendants have knowingly invited competition for limited paid advertising space displayed to potential customers seeking locksmith services from advertisers they know are operating scam locksmith operations.

167) Defendants have knowingly invited competition for limited advertising spots from both legitimate and illegitimate "scam" locksmiths that plaintiff knows are a) unlicensed in jurisdictions requiring locksmith licensing, such as Maryland and Virginia, b) unregistered to do business in jurisdictions requiring business registration, such as Washington, D.C., c) misrepresent basic information such as their physical address, and d) are well-documented by the media as fraudulent businesses.

168) Defendants have invited such illegitimate locksmiths to compete for advertising space with legitimate locksmiths, for a profit motive.

169) Implied in every contract is an implied duty of good faith and fair dealing.  It is bad faith for Defendants to knowingly dilute the value of the advertising paid for by Plaintiffs by knowingly burying Plaintiffs' listings under a large number of phony listings.

170) Plaintiffs are aware Defendants' advertising service is based on bid-per-click competition between legitimate competitors.  However, Defendants dilute the value of Plaintiffs' advertising dollars paid to Defendants by knowingly and deliberately allowing scam locksmiths to compete for the identical advertising positions being sold to Plaintiff.

## COUNT VII -  Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
## Misrepresentation of Geographic Origin
## of Services and Commercial Activities

171) 15 U.S.C. § 1125(a)(1)(B) of the Lanham Act creates a private cause of action for use in commerce of any false or misleading description of fact in commercial advertising of goods and services that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

172) Defendants make false or misleading description of fact or representation of fact in a commercial advertisement about their own or another's product by creating and publishing maps indicating locksmith businesses at locations at which Defendants are well aware are misrepresentations.

173) The published material at issue that 'misrepresents the geographic origin of… …another person's goods, services, or commercial activities' is:

(A)  The Defendants' own proprietary maps, created by Defendants and displayed on their own websites.  Defendants have created these maps and hold copyright in their maps.

(B)  Pinpoints on Defendants' maps, created solely by Defendants, that exist nowhere not authorized by Defendants and are not third party content.  The majority of Defendants' 'locksmith' map pinpoints indicate a locksmith where there is no locksmith.

(C)  Addresses for scam locksmiths, created by Defendants, that do not appear on the third-party websites they link to, or are different from the addresses that appear on the third-party websites they link to.  These phony addresses are Defendants' own original content and misrepresent the origin of a third-party's goods, services, and commercial activities.

(D)  Defendants' listings where no link to a third-party scam locksmith is provided at all, and all of the location-related content displayed on Defendants' maps is Defendants' own content because there is no third party website involved in the listing.

(E)  Defendants' original content include with their map results, such as but not limited to:

(a)  Street-view photographs taken by, owned by, and originating with each of the Defendants of storefronts of store locations appearing as pinpoints on their maps (many of Defendants' photos show there is no locksmith at the location listed by Defendants).

(b)  Driving times to and from phony locations listed by Defendants, pinpointed by Defendants, and often created entirely by Defendants.

(c)  Recommended driving directions created by Defendants to and from phony locksmith locations to the quarrying user.

(d)  Defendants showing the querying user's location as a pinpoint on the map results for terms such as 'locksmith'.  Defendants recommend locksmiths to the querying user based on the user's proximity to the (usually non-existing) locksmith location they list — a bald, knowing, deliberate misrepresentation of geographic origin of third party commercial services by Defendants.

174)Defendants create false addresses for third-party businesses that are either different from those provided on third-party websites, or created them out of whole cloth where none were provided by third-party websites at all.

175)Defendants publish address listed on third-party websites for locksmith businesses indicating a locksmith shop where they know with certainty that no locksmith shop exists.

176) Defendants have created proprietary maps (to which Defendants own and display copyright notice) that include pinpoints of locksmith businesses where no locksmith business exists, and at which Defendants know that know that no locksmith business exists at the time Defendants created the pinpoint.

177) Defendants' maps, and the pinpoints Defendants have created on their maps, do not appear anywhere but on Defendants' own websites or third-party website that Defendants have authorized to republish the map via RSS feed (or analogous technology) per contractual agreement.

178) Defendants indicate on their own websites' addresses and business locations for third-party locksmiths where no locksmith actually exists.

179) Defendants' misrepresentations are material and extremely pervasive.  Defendants's misrepresentations influence the decisions of many consumers regarding which locksmith to hire.

180) Defendants misrepresentations of the location and/or legitimacy of numerous scam locksmith businesses has deceived or has the tendency to deceive a substantial segment of their consumer audiences.

181) Defendant have placed their misrepresentations in interstate commerce by publishing this information on the internet.

182) Plaintiffs have been injured as a result of Defendants' misrepresentations by direct diversion of sales, by a lessening of goodwill associated with their products and services, and by a reduction in future profits.

# COUNT VIII - Conspiracy

183) Each and every Defendant is well aware that they are aiding and abetting scam locksmiths. Scam locksmiths are unnamed coconspirators.

184) Defendants are well aware of the true identities of the individuals behind the unlicensed, unregistered, or otherwise unlawful locksmith websites whose listings they display in their organic search results.

185) Defendants are well aware of the true identities of the individuals behind the unlicensed, unregistered, or otherwise unlawful locksmith websites whose listings they display in their map search results.

186) Defendants are well aware of the true identities of the individuals behind the unlicensed, unregistered, or otherwise unlawful locksmith websites whose listings they display in their paid advertised results.

187) Defendants are aware of the identities of individuals behind these illegitimate locksmith websites because they take their credit card and payment details in order to collect payment for advertising.

188) Defendants have removed some scam locksmith listings from their search engines upon receiving notice.  However, their occasional removal is disingenuous; as soon as one fraudulent listing is removed, several more nearly identical websites published by the identical party are queued by the Defendants to take its place.

189) On information and belief, Defendants continue posting advertisements without question or verification of basic information (such as the physical address of the listing) on behalf of parties that have had repeat take-down notices executed against their locksmithing websites.

190) Defendants have knowingly aided and abetted these fraudulent activities by creating content on their own Search Engine websites inducing consumers to believe that numerous business listings represent legitimate locksmiths are reliable and can be relied on by consumers.

191) Scam locksmiths would be a trivial matter but for Defendants' deliberate creation of a forum in which they can freely operate.

192) Defendants have created this forum for scam locksmiths as a tool for maximizing their own profits by compelling legitimate locksmiths to buy advertising as a result of being obscured by the legion of scam locksmiths whose very existence is enabled by Defendants.


**WHEREFORE**, Plaintiffs demand that this Court:

I.  Enter judgment against Defendants, jointly and severally, in equity, ordering:

a)  An injunction ordering Defendants to cease and desist publishing listings for unlicensed locksmiths operating in geographic jurisdictions that require locksmith licensing.

b)  An injunction ordering Defendants to cease and desist publishing map pinpoints identifying locksmiths at locations where there is no locksmith.

c)  An injunction ordering Defendants to cease and desist publishing estimated driving times and directions from and to map pinpoints identifying locksmiths at locations where there is no locksmith.

d)  An injunction ordering Defendants to cease and desist publishing paid advertisements for unlicensed locksmiths in jurisdictions requiring locksmith licensing.

II.  Enter judgment at law against Defendants, jointly and severally:

a)  Awarding Plaintiffs threefold damages shown at trial per 15 U.S. Code § 15.

b)   Awarding Plaintiffs damages in the amount shown at trial of lost good will and ongoing client relationships caused by Defendants' tortious conduct.

c)   Awarding Plaintiffs damages shown at trial in the amount of lost good will and ongoing client relationships caused by Defendants' tortious conduct.

d)   Awarding Plaintiffs damages shown at trial in the amount of lost publicity caused by Defendants' tortious conduct.

e)   Awarding Plaintiffs punitive damages for injuries caused by Defendants' tortious conduct.

f)   Awarding Plaintiffs damages for lost future profits cause by Defendants' conduct.

g)   Awarding Plaintiffs such other damages and relief as the Court finds just and equitable.

III.  Award Plaintiffs profits wrongfully obtained by Defendants per 15 U.S. Code § 1117 for violation of the Lanham Act, 15 U.S. Code § 1125(a)(1)(B), Misrepresentation of Geographic Origin of Services and Commercial Activities.

IV.  Award Plaintiffs attorney fees and the cost of this action.

# JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.
Dated this 13th day of January, 2017.

Respectfully Submitted,

/s/
Jeffrey Waintroob Roberts, Esq.
DC Bar No.: 1007523
Email: Jeff@RobertsAttorneys.com
Barry Roberts, Esq.
DC Bar No.: 77990
Email: Barry@RobertsAttorneys.com
**Roberts Attorneys, P.A.**

4440 PGA Blvd., Suite 204
Palm Beach Gardens, FL 33410
TEL: (561) 360-2737
**Attorneys for Plaintiff**